IN THE UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF TENNESEE
AT CHATTANOOGA

| | | |
|---|---|---|
| DESTINY GARNER, | * | |
|     Plaintiff, | * | |
| | * | |
| vs. | * | DOCKET NO. _____ |
| | * | |
| CHATTANOOGA NEIGHBORHOOD | * | |
| ENTERPRISES and MARTINA | * | |
| GUILFOIL, individually and in her | * | |
| capacity as agent of CNE, | * | |
|     Defendants. | * | |

## COMPLAINT

Plaintiff, Destiny Garner ("Plaintiff" or "Garner"), by and through counsel, for her Complaint against the named Defendants states as follows:

I.      <u>JURISDICTION AND VENUE</u>

1.      This is an action for money damages for violations of, among other things, civil rights, equal employment opportunity including, but not limited to, wrongful termination, discrimination on the basis of race and age, hostile work environment.

2.      This action is brought by the Plaintiff for violations of the common law of Tennessee, and statutory authority of the State of Tennessee pursuant to, inter alia, T.C.A. §4-21-101 et seq. and to redress the violation by the Defendants of the Plaintiff's rights secured by the Fourth and Fourteenth Amendments to the Tennessee Constitution and Constitution of the United States.

3.      This Honorable Court has jurisdiction over Plaintiff's claims as all acts and conduct complained of herein occurred in Hamilton County, Tennessee.

4. Plaintiff's claims pursuant to 42 U.S.C. § 1981 and §1983 under 28 U.S.C. §§ 1331 and 1343; and *Poling v. Goins*, 713 S.W.2d 305 (Tenn. 1986) may be transferred to The United States District Court which has jurisdiction to hear companion state law claims under 28 U.S.C. §1367 and the laws of the State of Tennessee.

5. Garner avers that Guilfoil, acted as an agent of CNE (President and Director) and was at all times relevant to this matter acting not only pursuant to CNE discriminatory policy practices, but also under color of law and under color of her office with CNE.

6. Garner further maintains that Guilfoil committed these violations, further set forth herein, as a result of policies, customs, practices, and/or procedures of CNE. Garner maintains that Guilfoil committed these violations, further set forth herein, as a result of policies, customs, practices, and/or procedures of CNE.

7. In addition, Garner avers that Guilfoil's acts and omissions subjected Garner to mental anguish, emotional distress, and loss of income and slander to his reputation.

8. At all times during the events herein described Guilfoil and CNE were engaged in a joint venture and assisted each other in performing the various acts described herein and lent their support to one another in performing their various actions as described and lent the authority of their respective offices and power to each other during the said events.

9. As an additional theory of claim, Garner avers that Guilfoil acted as an agent for CNE, and her acts and omissions were committed during her function as an agent for CNE, and thus CNE is liable to Garner pursuant to respondent superior.

10. This is an action to redress the deprivation of rights secured to Garner by the First and Fourteenth Amendments of the United States Constitution and for violations of Tennessee common law and statutory law. Thus, as to the § 1983 claims, this Court is

vested with original jurisdiction pursuant to the authority stated in *Haywood v. Drown*, 556 U.S. 729 (2009) and *Poling v. Goins*, 713 S.W.2d 305, 306 (Tenn. 1986). This Court is vested with original jurisdiction over Garner's state claims pursuant to T. C.A. § 16-10-101, et seq.

11.    Venue is proper in this Court pursuant to T.C.A. § 20-4-102, for acts averred herein occurred within Hamilton County. A more particularized description of the parties and status is:

a.    Garner is a resident of Hamilton County, Tennessee.

b.    Upon information and belief, Guilfoil is a resident of Hamilton County, Tennessee.

c.    CNE is a corporation authorized to do business in Tennessee with its primary place of business listed with the Tennessee Secretary of State as 1500 Chestnut Street, Suite 102, Chattanooga, Hamilton County, Tennessee.

d.    CNE is a quasi-governmental actor, and as more fully set forth herein, performs public governmental functions in concert with the City of Chattanooga ("City").

e.    Guilfoil is listed with the Tennessee Secretary of State as the registered agent for CNE.

## II.    PARTIES

12.    Plaintiff resides in Chattanooga, Hamilton County and is African-American.

13.    Chattanooga Neighborhood Enterprises, Inc. ("CNE") is a political subdivision of the State of Tennessee and at all times referenced herein, through its agent Defendant Martina Guilfoil ("Guilfoil") acted under color of law.

14.    Defendant, Guilfoil, was, at the time of the incidents giving rise to this claim, duly appointed and acting as the President and Director of CNE, acting under color of law and the statutes, ordinances, regulations, policies, customs and usages of the State of Tennessee. She is sued in his individual and official capacity.

### III.    GENERAL ALLEGATIONS

15.    Garner was hired by CNE on December 1, 2012 to work through the holidays as a temporary employee performing clerical work.

16.    After the holidays, Garner was hired in 2013 as a project worker.

17.    Garner worked in all of CNE's departments and eventually was hired into a full-time position in accounting by CNE.

18.    During this period, CNE was involved in a number of internal changes including the hunt for a new CEO.

19.    Because one of CNE's problem areas was accounting, Garner was moved to accounting in loan servicing to clean up that department's records, reporting, and operations.

20.    Garner found that the loans not only were out of order, but also were not logged into the system correctly.

21.    The system itself was erroneous because it allowed CNE to take money from homeowners (typically on the loan repayments), but would not properly track the money/payment; would erroneously add interest which was not contracted for under any agreement; and even would take the money/payment on the loan, but not deduct the payment from the principal due and owing.

22.    This and other problems were prevalent. CNE even hired an individual to work the file room. CNE confirmed that files to various loans were missing.

23.    Paula Panichello recommended Garner for the position of property manager.

24.    Garner became the Property Manager and Escrow Specialist despite having no prior experience in either area. Garner received some brief training from Jennifer Holder who was the assistant property manager and escrow specialist. Ms. Holder moved to

a different position at the end of one (1) week leaving Garner to perform the duties of property management and escrow specialist.

25.     Because of Garner's skill set, she enjoyed the position and became good at the work.

26.     Garner received performance reviews which confirmed my good work performance.

27.     Garner was never reprimanded nor otherwise told that Garner was not fulfilling my responsibilities in the job properly.

28.     CNE never provided Garner with an assistant although the property manager and assistant property manager before me had an assistant.

29.     Garner was required to learn more "on the go," with no support or training.

30.     The system CNE had in place was to address invoices for insurance when they came in to CNE. If an invoice did not come in, pursuant to CNE policy, it was not paid. CNE was required to pay invoices for insurance whether clients had money in their accounts or not.

31.     During this time, despite Garner's continued warnings and suggestions to change, CNE had no checks and balances in place to prevent loans, insurance policies, and the like from falling through the proverbial cracks and being missed.

32.     CNE had no system in place to notify Garner as property manager or escrow specialist, of the expiration or lapse in someone's insurance.

33.     Upon Martina Guilfoil's hire, CNE required her to make reports to the Board.

34.     The Board discovered that the escrow accounts did not match with the reports Guilfoil prepared and presented to the Board.

35.     CNE management would adjust the numbers or create completely new numbers with no underlying support just to make the records balance. These steps were undertaken in an effort to fix the records.

36.     One (1) year later, Guilfoil finally acknowledged that CNE needed a better system that would track all the data and run accurate reports.

37.     During this year, Guilfoil never made a bad report on Garner's work performance. Garner never received a poor performance review or evaluation.

38.     During her four (4) years working with CNE, Garner experienced hostile work environment practices and disclosed them to Lisa Fields and Ken Goss who were at the time: Human Resources Manager and CFO, respectively with CNE.

39.     Garner was continually harassed and nothing was done about it.

40.     The harassment came in the form of emails, staff meetings where Garner was singled out in front of the staff regarding confidential complaints, co-workers meeting together to discuss Garner's job duties contemporaneously making derogatory statements concerning Garner.

41.     Garner even went to Guilfoil for guidance on how to handle the situation. Guilfoil said follow policy – which was refer to HR. Garner reported the incidents to HR, yet HR never took any action. No memoranda, no meetings, no disciplinary action, nothing.

42.     After complaining Garner learned that Guilfoil engaged in discriminatory practices of her own fostering this environment throughout CNE.

43.     By way of example, one buyer, a black male, did business with CNE for several years, purchasing homes CNE listed for sale due to various conditions of alleged default on the part of homeowners.

44.     Initially, Guilfoil had no problem with the black male buyer. Often, she spoke highly of him. Then, one day, her attitude changed. The black male buyer was set to purchase two (2) homes from CNE.

45.     Garner was instructed by Guilfoil to delay the closings. She told Garner she did not want to do business with the black male buyer.

46.     Guilfoil required Garner to tell the black male buyer that CNE would not sell property to him.

47.     Of the two (2) properties which the black male buyer was prepared to purchase, Guilfoil ordered one to be demolished and the other sold to another buyer, who upon information and belief, was white.

48.     Guilfoil even profiled other, minority, buyers asking questions like "where would he get the Money?" Guilfoil would find ways to avoid sales by not accepting bids from various minority buyers. These included Section 8 individuals who qualified and could otherwise purchase CNE homes, but were repeatedly turned away. Garner is not aware of non-minority buyers who had this reaction from Guilfoil.

49.     Guilfoil's discriminatory practices extended to employees as well.

50.     Specifically, CNE was proud when it purchased a home, gutted it and provided it to a non-minority. CNE actually bent the rules to make that happen for some non-minorities.

51.     However, for its black employees, it could not provide the same treatment.

52.     For example, a black employee lived in a bad neighborhood and needed a place to rent to leave that area. Guilfoil did not want to rent to her.

53.     Guilfoil did not rent to her.

54.     Garner continued to work through 2015 and into 2016.

55.     On February 26, 2016, Garner took leave on medical short term disability to address a medical issue with Garner's eye and have surgery.

56.     During this period before Garner's short term disability, Garner and others were still trying to enter information and process accurate reports.

57.     Garner has been out on short term disability since.

58.     While out on her short term disability, Garner received a termination letter stating that Garner was fired for theft.

59.     CNE did not identify any dates of the alleged theft. Nor did CNE identify any amounts of the alleged theft. CNE also did not notify Garner of what she was accused of stealing – especially since she had been out for two (2) months.

60.     Sometime in February, 2014, Garner was told to place all home loans where no insurance was in place on "force place insurance"; this included deferred loans (e.g, loans whose repayment was not to begin until 2018).

61.     CNE paid the insurance for several homeowners, but because of problems identified previously herein, of which CNE was aware, the system did not record those payments.

62.     There was no mechanism or procedure which was approved by CNE that added those insurance payments to the loan. Moreover, there was nothing in the loan documents which provided notice to the homeowner that insurance was necessary – even when the payment was deferred.

63.     This practice went on for some time.

64.     In fact, it was not unusual to find that a homeowner was burdened by forced place insurance for three (3) years or more without notice or opportunity to cure and place their own insurance coverage.

65.     While Garner was out on short term medical disability, she learned that CNE was back dating all files and making all homeowners pay for forced place insurance. Garner thought that was a bad policy practice and voiced it – even though not at work.

66.     Garner's reasoning was that the problem with this method of forced pay insurance was that a homeowner became immediately responsible for three (3) years' worth of force place insurance (for prior years and the then current year).

67.     Garner's grandmother, Annie Careathers, was one of several victims of this method of accounting.

68.     Annie Careathers was notified that even though the terms of her loan agreement with CNE did not require her to place insurance on the home, that she would have to immediately pay three (3) years' worth of forced place insurance.

69.     One (1) week after disagreeing with the forced place insurance practice, Garner was sent a termination letter.

70.     Despite the foregoing, the proffered discriminatory excuse for Garner's termination was that CNE believed Garner violated policies and procedures. CNE purported to provide examples, but the examples are deficient in several meaningful ways.

71.     The harassment from Guilfoil was continuous, as Guilfoil repeatedly talked about Garner's weight and accent all in connection with demeaning her job performance without cause or reason. Specifically, Guilfoil consistently and constantly talked about Garner's accent saying, you are either really black at times and country at other times. Guilfoil set in motion Garner's perception that Garner was not black enough at times or more appropriately, that Garner had to be what Guilfoil wanted her to be. Guilfoil would consistently say, let [Destiny} handle the matter" (so long as the client was black.)

72.     Additionally, Guilfoil hired inexperienced individuals, who were white, with mortgages and other conveniences provided by CNE. Certain of these privileges were not provided to black employees, including, but not limited to, Garner.

73.     Guilfoil, rewarded these inexperienced individuals, who were white, with mortgages and other conveniences provided by CNE. Certain of these privileges were not provided to black employees, including, but not limited to, Garner.

74.     Throughout her employment, Guilfoil made offensive, racially insulting and insensitive remarks, as well as sexually suggestive comments to and around Garner.

75.     Guilfoil also treated Garner differently from other employees based upon her race, ethnicity and national origin. Garner is African American.

76.     These and other problems for Garner began when CNE hired Guilfoil as the new CEO. Guilfoil was white and would continually insult non-white employees, including Garner, and would mock other employees' accents and linguistics. Guilfoil made constant insinuations that non-white employees, such as Garner, were inferior to her.

77.     Garner warned of predatory practices. Specifically, Garner learned, while out on medical leave, that the information, required by law, and which Garner later learned Defendants relied upon to terminate her, was never put into the system, or calculated correctly.

78.     The annual Christmas party for CNE in 2014 was held at a bowling alley in Chattanooga, called Pin Strikes.

   a.      During the party, CNE employees took part in different activities.

   b.      One activity was a laser tag competition.

   c.      A Hispanic employee was paired with two African American CNE employees.

   d.      This trio won the competition.

e.     Guilfoil said to the Hispanic employee at a following office meeting that his team won the competition only "because everyone on your team is dark and we could not see you."

79.     Guilfoil constantly made crude racial jokes, once telling an African American employee, that the African American employee should change her name to "Chloe" so that she could ask for a pay raise because that name, "sounded white."

80.     Guilfoil made constant and pervasive comparison between whites and non-whites and she would constantly make such comments in front of Garner to demean Garner and highlight Guilfoil's perception of her own racial superiority.

81.     As part of her notice to CNE that CNE's practices were woefully wrong and unfairly and discriminatorily impacted minorities, Garner found that under Guilfoil's direction, CNE was giving false figures to the City to make the accounts appear reconciled when, in fact, they were not, and that under Guilfoil's direction, CNE was utterly failing to reconcile accounts and was co-mingling funds and paying expenses from the wrong accounts, in violation of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601, *et. seq.*

82.     The City receives federal funds from HUD as loans to persons needing affordable housing and/or to improve their current housing. CNE had a duty to the City to properly manage and account for the funds the City received from HUD.

83.     Plaintiff Garner made numerous requests for meetings with Guilfoil to discuss reconciliation of the accounts and was ignored or rebuffed by Guilfoil.

84.     The reconciliation of the accounts is a report to the City that the federal funds the City obtained from HUD were being properly managed.

85.     Had Garner been successful in the reconciliation of the accounts, the City would have been fully alerted to the fact that Guilfoil and CNE were grossly mismanaging the accounts.

86.     Then Human Resource Manager Lisa Fields ("Fields") terminated Garner's employment on April 14, 2015, under the pretext of "theft and poor performance."

87.     Neither CNE nor Guilfoil provided Garner with a pre/post-termination hearing, or any other manner or ability to have the reasons for his termination addressed by the CNE Board of Directors.

88.     The stated reason for termination is wholly without merit as this large non-profit employing dozens of employees needs a Property Manager and Loan Supervisor.

89.     Since Garner's termination, CNE hired another individual to take Garner's place. She is Melinda Jackson. Zachary Downs also worked in Garner's position.

90.     CNE has a past history of scandals, to include financial scandals, prior to the hiring of former Chief Executive Officer David Johnson who was to "clean up" CNE.

91.     However, CNE hired Guilfoil as David Johnson and Rick Ebersole's successor with the full knowledge that Guilfoil had the propensity for misconduct.

92.     CNE knew at the time Guilfoil interviewed with CNE for the Chief Executive Officer position that Guilfoil resigned in 2010 as a CEO from a former employer, Rainier Valley Community Development Fund, while under investigation for professional misconduct.

93.     Despite this full knowledge by CNE, CNE Board member Steve Johnson disregarded Guilfoil's past misconduct and (as reported by the Times-Free Press) dismissed it as, "merely a joke that got out of hand."

94.     The "joke" was a document drafted by Guilfoil to one Seattle resident Jessie Jones who had applied for a loan for her hair salon.

95.     In the document (according to Seattle TV station KIRO 7 and the Times –
Free Press), Guilfoil wrote: "I want to tell you that you are one crazy-ass b*&$h. It was a
complete waste of time for you to come before the board, though it did provide us with some
comic relief."

Causes of Action:

Count One:

Violation of Civil Rights

Under Color of Law – First Amendment

96.     Under the First Amendment of the United States Constitution, Garner had
an absolute right to express her concerns of the gross mismanagement of public taxpayer
funds to her CEO, to the City and to the Board of Directors of CNE.

97.     The acts of Guilfoil constituted retaliation discharge and an attempt to
silence Garner and discredit her in addition to hiding the failures to reconcile the accounts,
as well as lost funds. The termination and proffered excuse is a gross mismanagement of
public taxpayer funds.

98.     Guilfoil's actions deprived Garner, without Due Process of Law, of her right
to exercise free speech by a report of misconduct to human resources, the City of
Chattanooga, and the Board of Directors for CNE. Garner sues Guilfoil in her official
capacity and her individual capacity.

99.     CNE's prior history of misconduct, and the Board of Director's employment of
Guilfoil despite the full knowledge of her propensity to misconduct was a deliberate
indifference to the rights of Garner and had the force of official policy of CNE.

100.    To have hired Guilfoil, and then ignore Garner's attempts to report the gross
mismanagement of public taxpayer funds by allowing Guilfoil to continue in her powerful

role and employment was a direct and proximate cause of Garner's damages, and constituted CNE condoning Guilfoil's misconduct.

101.    The Board of Directors is the highest policy making level of CNE, and its deliberate indifference and continued employment of Guilfoil constitutes a custom that carries the force of official policy of CNE.

102.    In the alternative, Guilfoil, the President of CNE acted as the policy maker of CNE, and her active and direct participation in the events outlined in this Complaint constituted the direct participation of CNE in the violations set forth herein.

103.    Garner sues CNE in its governmental capacity and Guilfoil in her individual and official capacities.

104.    As a result of their conduct, Defendants are liable for Plaintiff's injuries, either because they were integral participants in the misconduct, or because they failed to intervene when they had the opportunity and duty to do so to prevent these violations.

105.    Plaintiff alleges that the acts of the individual Defendants were willful, malicious, intentional, oppressive, reckless, and/or were done in willful and conscious disregard of Plaintiff's rights, welfare, and safety, thereby justifying the awarding of punitive damages in an amount to be determined at trial.

106.    As a direct and legal result of Defendants' acts and omissions, Plaintiff has suffered damages, including, without limitation, pain and suffering, extreme mental and emotional distress, severe physical injuries, medical expenses, attorneys' fees, costs of suit, loss of earnings, and other pecuniary losses not yet ascertained.

Count Two:

Violation of Civil Rights

Under Color of Law – Denial of

Procedural Due Process

107.    Garner had a proprietary interest in her employment with CNE.

108.    CNE had a mechanism for a post-deprivation hearing to challenge the termination, but that was never explained to Garner by Guilfoil.

109.    CNE failed to set forth any official notice of any post-deprivation hearing or make it known to Garner, and this constituted deliberate indifference of CNE.

110.    The acts of Guilfoil constituted deceit in her refusal to notify Garner of her ability to seek recourse of her actions with the Board of Directors.

111.    The acts claimed herein by the defendants violated Garner's right to Procedural Due Process to challenge the termination to the Board of Directors.

112.    Garner sues Guilfoil in her individual and official capacities and CNE in its governmental capacity.

113.    As a result of their conduct, Defendants are liable for Plaintiff's injuries, either because they were integral participants in the misconduct, or because they failed to intervene when they had the opportunity and duty to do so to prevent these violations.

114.    Plaintiff alleges that the acts of the individual Defendants were willful, malicious, intentional, oppressive, reckless, and/or were done in willful and conscious disregard of Plaintiff's rights, welfare, and safety, thereby justifying the awarding of punitive damages in an amount to be determined at trial.

115.    As a direct and legal result of Defendants' acts and omissions, Plaintiff has suffered damages, including, without limitation, pain and suffering, extreme mental and emotional distress, severe physical injuries, medical expenses, attorneys' fees, costs of suit, loss of earnings, and other pecuniary losses not yet ascertained.

Count Three:

Violation of Civil Rights

Under Color of Law – Denial of

Equal Protection

116.    Garner had a right to be free from discrimination in employment as set forth in Title VII of the Civil Rights Act and 42 U.S.C. § 1981 and 1983.

117.    The acts averred herein in Paragraphs 30 – 49 and 50 through 72 reveal a discriminatory intent of the defendants to deprive Garner of her employment with CNE without the Due Process of Law.

118.    Garner sues Guilfoil in her individual and official capacities and CNE in its governmental capacity.

119.    As a result of their conduct, Defendants are liable for Plaintiff's injuries, either because they were integral participants in the misconduct, or because they failed to intervene when they had the opportunity and duty to do so to prevent these violations.

120.    Plaintiff alleges that the acts of the individual Defendants were willful, malicious, intentional, oppressive, reckless, and/or were done in willful and conscious disregard of Plaintiff's rights, welfare, and safety, thereby justifying the awarding of punitive damages in an amount to be determined at trial.

121.    As a direct and legal result of Defendants' acts and omissions, Plaintiff has suffered damages, including, without limitation, pain and suffering, extreme mental and emotional distress, severe physical injuries, medical expenses, attorneys' fees, costs of suit, loss of earnings, and other pecuniary losses not yet ascertained.

Count Four:

Violation of Tennessee

Human Rights Act – Discrimination

122.    CNE, by and through its agents and employees, had knowledge of the disparate treatment and hostile work environment inflicted upon Garner and failed to take

prompt effective remedial action. Thus, the discrimination and harassment continued. Garner therefore sues CNE for harassment and disparate treatment.

123.    CNE's conduct as alleged herein in Paragraphs 72 through 98 also constitutes discrimination against Garner effecting a term condition or privilege of employment because of her race, ethnicity, national origin, and sex, in violation of TENN. CODE ANN. § 4-21-101, *et seq.*

124.    CNE is responsible for the discriminatory actions and harassment of its agents and employees under the doctrine of respondent superior and under agency principles because of their supervisory positions and because they knew or should have known of their actions and failed to take prompt effective and complete remedial action. By this failure, CNE acquiesced in, approved and ratified the actions of its supervisory employees as set forth herein.

125.    As a result of CNE's actions, Garner sues for discrimination.

126.    As a result of the aforesaid, CNE violated the provisions of the Tennessee Human Rights Act, TENN. CODE ANN. § 4-21-101, et seq.

127.    As a result of CNE's illegal actions, Garner lost tangible job benefits including a loss of income and benefits, both past and future, and she has suffered and will continue to suffer emotional distress and pain and suffering, and other non-pecuniary losses as a direct result of CNE's discriminatory actions.

128.    The actions of CNE as set forth herein, were intentional or with reckless indifference to Garner's protected rights such as to justify the imposition of substantial punitive damages.

129.    Guilfoil is liable as an aider and abettor pursuant to TENN. CODE ANN. § 4-21-301 (2).

130.    Garner sues CNE in its corporate and governmental capacities.

131.    As a result of their conduct, Defendants are liable for Plaintiff's injuries, either because they were integral participants in the misconduct, or because they failed to intervene when they had the opportunity and duty to do so to prevent these violations.

132.    Plaintiff alleges that the acts of the individual Defendants were willful, malicious, intentional, oppressive, reckless, and/or were done in willful and conscious disregard of Plaintiff's rights, welfare, and safety, thereby justifying the awarding of punitive damages in an amount to be determined at trial.

133.    As a direct and legal result of Defendants' acts and omissions, Plaintiff has suffered damages, including, without limitation, pain and suffering, extreme mental and emotional distress, severe physical injuries, medical expenses, attorneys' fees, costs of suit, loss of earnings, and other pecuniary losses not yet ascertained.

Count Five:

Negligent Hiring

134.    CNE knew of Guilfoil's history of misconduct and discriminatory behavior yet hired her to occupy a position of power over Garner, which allowed Guilfoil to commits the torts and acts as set forth in this Complaint.

135.    As a direct and proximate result of CNE's illegal actions, Garner lost tangible job benefits including a loss of income and benefits, both past and future, and she has suffered and will continue to suffer emotional distress and pain and suffering, and other non-pecuniary losses as a direct result of CNE's negligent hiring.

136.     The actions CNE as set forth herein, were intentional or with reckless indifference to Garner's protected rights such as to justify the imposition of substantial punitive damages.

137.    Garner sues CNE in its corporate and governmental capacities.

138.     As a result of their conduct, Defendants are liable for Plaintiff's injuries, either because they were integral participants in the misconduct, or because they failed to intervene when they had the opportunity and duty to do so to prevent these violations.

139.     Plaintiff alleges that the acts of the individual Defendants were willful, malicious, intentional, oppressive, reckless, and/or were done in willful and conscious disregard of Plaintiff's rights, welfare, and safety, thereby justifying the awarding of punitive damages in an amount to be determined at trial.

140.     As a direct and legal result of Defendants' acts and omissions, Plaintiff has suffered damages, including, without limitation, pain and suffering, extreme mental and emotional distress, severe physical injuries, medical expenses, attorneys' fees, costs of suit, loss of earnings, and other pecuniary losses not yet ascertained.

Count Six:

Negligent Retention

141.     Due to its conduct, CNE is liable to Garner for the wrongful retention of Guilfoil.

142.     Although CNE was aware of Guilfoil's behavior as reported by Garner, CNE failed to take any corrective or disciplinary action against Guilfoil, which emboldened Guilfoil and allowed her to feel that she could continue her discrimination and harassment of Garner with impunity.

143.     As a direct and proximate result of CNE's illegal actions, Garner lost tangible job benefits including a loss of income and benefits, both past and future, and she has suffered and will continue to suffer emotional distress and pain and suffering, and other non-pecuniary losses as a direct result of CNE's discriminatory actions.

144.    In addition, the acts and negligence of CNE as set forth herein, were intentional or with reckless indifference to Garner's protected rights such as to justify the imposition of substantial punitive damages.

145.    Garner sues CNE in its corporate and governmental capacities.

146.    As a result of their conduct, Defendants are liable for Plaintiff's injuries, either because they were integral participants in the misconduct, or because they failed to intervene when they had the opportunity and duty to do so to prevent these violations.

147.    Plaintiff alleges that the acts of the individual Defendants were willful, malicious, intentional, oppressive, reckless, and/or were done in willful and conscious disregard of Plaintiff's rights, welfare, and safety, thereby justifying the awarding of punitive damages in an amount to be determined at trial.

148.    As a direct and legal result of Defendants' acts and omissions, Plaintiff has suffered damages, including, without limitation, pain and suffering, extreme mental and emotional distress, severe physical injuries, medical expenses, attorneys' fees, costs of suit, loss of earnings, and other pecuniary losses not yet ascertained.

Count Seven:

Violation of Tennessee

Human Rights Act – Malicious Harassment

149.    CNE, by and through its agents and employees, had knowledge of the harassment and retaliation inflicted upon Garner by Guilfoil and failed to take prompt effective remedial action. Thus, the harassment and retaliation continued and Garner therefore sues CNE and Guilfoil for malicious harassment pursuant to TENN. CODE ANN. § 4-21-207.

150.    CNE is responsible for the malicious harassment of its employees including Garner as set forth in Paragraphs 47 through 72 and 73 through 86 and 90 through 97

under the doctrine of respondent superior and under agency principles and the termination of Garner's employment was known to the Board of Directors and conducted by the President of its corporation: Guilfoil. CNE failed to take prompt effective and complete remedial action. By this failure, CNE acquiesced in, approved and ratified the actions of its supervisory employees as averred herein.

151.    As a result of CNE and Guilfoil's illegal actions, Garner lost tangible job benefits including a loss of income and benefits, both past and future, and she has suffered and will continue to suffer emotional distress and pain and suffering, and other non-pecuniary losses as a direct result of CNE and Guilfoil's malicious actions.

152.    The actions of CNE and Guilfoil as set forth herein, were intentional or with reckless indifference to Garner's protected rights such as to justify the imposition of substantial punitive damages.

153.    Garner sues CNE in its corporate and governmental capacities and Guilfoil in her official and individual capacities.

154.    As a result of their conduct, Defendants are liable for Plaintiff's injuries, either because they were integral participants in the misconduct, or because they failed to intervene when they had the opportunity and duty to do so to prevent these violations.

155.    Plaintiff alleges that the acts of the individual Defendants were willful, malicious, intentional, oppressive, reckless, and/or were done in willful and conscious disregard of Plaintiff's rights, welfare, and safety, thereby justifying the awarding of punitive damages in an amount to be determined at trial.

156.    As a direct and legal result of Defendants' acts and omissions, Plaintiff has suffered damages, including, without limitation, pain and suffering, extreme mental and emotional distress, severe physical injuries, medical expenses, attorneys' fees, costs of suit, loss of earnings, and other pecuniary losses not yet ascertained.

Count Eight:

Violation of Tennessee

Whistle Blower's Act – Tenn. Code Ann. § 50-1-304

157. Garner brings this claim in her capacity as an employee of CNE.

158. CNE discharged Garner in retaliation for her refusal to participate in false accounting practices and her complaints about and refusal to stay silent about illegal activities.

159. At the time of his termination, Garner was an employee of CNE and was terminated based upon her refusal to participate in or remain silent about illegal activities. There is a causal relationship between her refusal and his termination.

160. As a result of CNE's conduct, Garner has lost tangible job benefits including the loss of income and benefits, both past and future, and she has suffered and will continue to suffer irreparable injury, emotional distress, pain and suffering and other non-pecuniary losses as a direct result of CNE's illegal actions.

161. CNE is responsible and liable under the doctrine of respondent superior and agency principles for the conduct of its supervisory employees involved in this matter and to whom Garner tried to report the misconduct averred in this Complaint. CNE acquiesced, approved and ratified the actions of its supervisory employees as set forth herein by CNE's failure to fully and completely act upon Garner's reports.

162. As a result of CNE's conduct, Garner has lost tangible job benefits including the loss of income and benefits, both past and future, and she has suffered and will continue to suffer irreparable injury, emotional distress, pain and suffering and other non-pecuniary losses as a direct result of CNE's illegal actions.

163.    The actions of CNE, as set forth herein, were intentional or with reckless disregard to Garner's protected rights such as to justify the imposition of substantial punitive damages.

164.    As a result of their conduct, Defendants are liable for Plaintiff's injuries, either because they were integral participants in the misconduct, or because they failed to intervene when they had the opportunity and duty to do so to prevent these violations.

165.    Plaintiff alleges that the acts of the individual Defendants were willful, malicious, intentional, oppressive, reckless, and/or were done in willful and conscious disregard of Plaintiff's rights, welfare, and safety, thereby justifying the awarding of punitive damages in an amount to be determined at trial.

166.    As a direct and legal result of Defendants' acts and omissions, Plaintiff has suffered damages, including, without limitation, pain and suffering, extreme mental and emotional distress, severe physical injuries, medical expenses, attorneys' fees, costs of suit, loss of earnings, and other pecuniary losses not yet ascertained.

WHEREFORE, PREMISES CONSIDERED, PLAINTIFF PRAYS:

A.    That Garner have proper process to compel CNE and Guilfoil to appear and answer by service of copy of the summons and complaint in this cause but their oath to said answer is waived.

B.    That an injunction be issued prohibiting the aforesaid practices in the future.

C.    That Garner be awarded attorney fees to prosecute this action.

D.    That Garner be awarded damages for his lost time of work both backward and forward since reinstatement would place Garner in a hostile environment.

E.    That Garner be awarded punitive or exemplary damages to deter defendants from repeating this wrong doing and trespass.

F. That Garner be awarded discretionary costs for bringing this action together with prejudgment interest.

G. That Garner be allowed an election of remedies after bifurcation of his trial.

H. That Garner have a jury to try to issues when joining.

I. That Garner be awarded the amount of $5,000,000.00, which is inclusive of the various damages outlined above.

J. That Garner have such other and further general relief to which he is entitled into which this Court's finds suitable, equitable and proper.

5. GARNER DEMANDS A JURY TO TRY ALL ISSUES.


RESPECTFULLY SUBMITTED,

BOWE & ASSOCIATES, PLLC

By: */s/ Curtis L. Bowe, III*
Curtis Bowe, III (BPR 017037)
*Attorney for Plaintiff*
707 Georgia Avenue, Suite 301
Chattanooga, Tennessee 37402
423.475.6070/423.475.6072